<u>NOT FOR PUBLICATION</u>

## <u>UNITED STATES DISTRICT COURT</u><br><u>FOR THE DISTRICT OF NEW JERSEY</u>

—————————————————————
:
UNITED STATES OF AMERICA,   :
                                :
       Plaintiff,      :
                                :       Criminal No. 07-687 (JAG)
           v.         :
                                :          **OPINION**
FIRAS AL-SALIBI, a/k/a "Joseito   :
Montalvo," a/k/a "Azra Eliaho,"   :
                                :
       Defendant.     :
—————————————————————:

<u>GREENAWAY, JR., U.S.D.J.</u>

      This matter comes before this Court on Defendant Firas Al-Salibi's ("Defendant" or "Al-Salibi") omnibus motion seeking, <u>inter alia</u>, to exclude evidence recovered from a search of Nidal Slaibi's[1] ("Nidal") residence, conducted on February 1, 2007.  For the reasons set forth below, Defendant's motion is denied.

## I. <u>PROCEDURAL HISTORY</u>

      On June 15, 2007, the United States (the "Government") filed a complaint against Defendant, charging one count of "knowingly and willfully mak[ing] a false statement in an application for a passport," in violation of 18 U.S.C. §§ 2 and 1542, and one count of "knowingly and willfully transfer[ing], possess[ing], and us[ing], without lawful authority, a means of

—————————————

[1] Nidal Slaibi is Defendant's brother; however, there is a slight variation in the spelling of Defendant's and Nidal's surnames.  (<u>Compare</u> Compl. Attach. A ("Firas <u>Al-Salibi</u>") (emphasis added) <u>with</u> Mot. to Suppress Hr'g Tr. ("Tr. 1") 119:10, Dec. 6, 2007 ("Nidal <u>Slaibi</u>") (emphasis added).)

identification of another person," in violation of 18 U.S.C. §§ 2 and 1028A(a)(1).  (Compl.

Attach. A.)  Defendant was indicted on the same charges on August 17, 2007.  (See generally,

Indictment.)

On October 3, 2007, Defendant filed an omnibus motion requesting an order:

1.    suppressing all evidence seized on or about February 1, 2007[,] pursuant to a warrantless search;

2.    suppressing all evidence developed as a result of the fruits of that search;

3.    [r]equiring the government to provide notice and a preliminary hearing on any other crimes evidence;

4.    [d]irecting the government to immediately produce all exculpatory evidence;

5.    [d]irecting the government to identify any expert testimony it intends to use, [to] identify any matters of which it will seek to have the court take judicial notice and [to] produce any charts or summaries which it intends to use;

6.    [d]irecting the government to produce Jencks Act [m]aterial prior to trial and to preserve all rough notes, interview notes, report drafts and final reports; and

7.    [p]ermitting Al-Salibi to file whatever additional motion [that] may become necessary.

(See Notice of Mot. to Suppress 1-2.)  This Court resolved the requests made in numbers 3-7

during the December 6, 2007 hearing.  (See Tr. 1 5:1-9:15; see also Order Amending Mot. to

Suppress Hr'g Trs., Feb. 8, 2008.)  At present, this Court need only address the requests made

concerning the suppression of evidence.[2]

## II.  FACTUAL BACKGROUND

Defendant Firas Al-Salibi, a non-resident alien, was born in 1974 in the West Bank, a

---

[2] The Government construed, and Defendant agreed, that the motion pertains only to a suitcase and toiletries bag.  (Mot. to Suppress Hr'g Tr. ("Tr. 3") 20:17-21:10, Jan. 14, 2008.)

Palestinian territory.  (See Compl. Attach. B; see also Gov't Mem. in Opp'n to Mot. to Suppress ("Gov't Opp'n") 3 n.2.)  At some point, Defendant traveled to the United States.[3]  His legal stay expired, and on January 22, 2007, Defendant was arrested, pursuant to an outstanding immigration warrant.  (Compl. Attach. B.)  Defendant has been in the custody of immigration authorities since that time, and has an order of deportation entered against him.  (Id.; see also Tr. 1 29:22-24.)

Prior to Defendant's arrest, the Federal Bureau of Investigation ("FBI") conducted an investigation of Defendant related to identity theft and other fraudulent activities.  (Tr. 1 28:11-17.)  As a result of the investigation, the FBI suspected that Defendant possessed, and used, fraudulent identification.  (Id. at 28:23-29:12.)

## A.    Defendant's Communications with Nidal Slaibi

After Defendant was arrested, he called his brother, Nidal, from the detention facility, and requested Nidal's assistance in recovering his belongings.  (Tr. 1 124:18-127:1.)  Defendant asked Nidal to "go to his apartment and get his belongings . . . " (id. at 125:9-10), and mentioned specifically that Nidal should recover a "bra" (id. at 125:25-126:3).  Nidal understood Defendant's reference to a "bra" to be code for a fraudulently-obtained identification document, possibly a passport.  (Id. at 126:9-127:1.)

Later, Nidal received a letter, written in Arabic, from Defendant.[4]  (Id. at 53:4-6; see also

---

[3] It is unclear when Defendant arrived in the United States, and which immigration method permitted him entry.

[4] Defendant wrote this letter on January 23, 2007, the day after his arrest.  (See Ex. G-3.1.)  However, Nidal did not receive the letter until some time after speaking with Defendant, on a number of occasions, via telephone.  (Tr. 1 127:2-9.)

Ex. G-3.1.)  The letter notified Nidal of Defendant's arrest, and asked Nidal to perform certain

tasks.  (Tr. 1 53:21-56:8; see also Ex. G-3.2[5].)  Specifically, Defendant stated, among other

things,

> Nidal, I live across the street from the bakery called MONDIAL, 35 Hackensack
> Ave., Kearny, NJ . . . go down [to] the basement and grab my suitcase[,] my clothing
> and my brush[.] [R]egarding the car[,] it is at the New Rochelle Park Police Station
> in New Jersey. . . . Nidal, the car title is in the suitcase, if you can please make sure
> you insure it, issue a license for it and take it[.] [T]he car is clean and there are no
> other problems. . . . If you want[,] take all the stuff I have in the car, they are yours,
> it is not important to me, and take the car as well.

(See Ex. G-3.2.)  The letter emphasized that "[t]he most important thing to me is the suitcase and

my clothing, my underwear. . . . VERY IMPORTANT[] Nidal, the suitcase is extremely

important important important, number one is the suitcase, the most important thing, extremely

important[.]"  (Id.)

As a result of the telephone calls and letter, Nidal believed that Defendant had given him

permission to retrieve, and access, Defendant's belongings.  (Tr. 1 127:8-9; see also Mot. to

Suppress Hr'g Tr. ("Tr. 2") 5:1-3, 7:12-19, Dec. 19, 2007.)  Nidal also stated that Defendant did

not restrict his access to the property.  For example, Defendant did not tell Nidal to recover his

belongings, but not to open, or look through them.  (Tr. 2 4:22-25.)  Thereafter, Nidal went to

Defendant's apartment and spoke to the landlord.[6]  (Id. at 8:15-17.)  Nidal recalls that

> I introduced myself to [the landlord] and I told him, I am the brother of Firas, and I
> gave him my license and my information, and I told him that my brother was arrested
> for immigration, and if he was - - he would give me permission to, basically, go to
> my brother's apartment and try to get all his belongings, because he was on

---

[5] The letter was subsequently translated and transcribed into English.

[6] Nidal does not provide the date on which he went to Defendant's apartment.  He simply
indicates that "[i]t was a few days after [Defendant] was arrested."  (Tr. 2 8:14.)

4

deportation and no longer would be living there.

(Id. at 8:17-23.)  The landlord allowed Nidal to enter the apartment, and Nidal attempted to

gather as many items as he could.  (Id. at 9:5-11.)  Nidal retrieved the suitcase, and placed inside

of it some of Defendant's belongings.  (Id. at 9:11-13.)  Defendant took home the suitcase, with

the enclosed belongings, and intended to return to the apartment to recover the remaining items.

(Id. at 9:13-20.)

After arriving at his home, Nidal looked through the suitcase "for information about the

car."  (Id. at 9:21-23.)  The suitcase did not have a lock.  (Id. at 11:10-14; see also Tr. 1 42:10-13

(Angel Alicea, a Special Agent of the FBI, stated that the suitcase was not locked, or otherwise

secured).)  Nidal discovered the car title, and other documents, in a toiletries bag[7] located inside

one of the suitcase's compartments.  (Tr. 2 10:2-6.)  The toiletries bag did not have a lock.  (Id. at

11:15:18; see also Tr. 1 46:16-23 (Special Agent Alicea stated that the toiletries bag was

unzipped).)  After removing the title and a driver's license, both in the name of Azra Eliaho,

Nidal left the toiletries bag on his bedroom dresser.  (Tr. 2 10:12-16, 12:1-6.)

## B.     Search of Nidal Slaibi's Residence

### 1.     Nidal's Verbal Consent to the Search of His Residence

On February 1, 2007, an individual purporting to be Defendant's landlord called the FBI.

(Tr. 1 33:15-34:22.)  The landlord stated that Nidal Slaibi had come to his home and requested

entry to a room that had been rented to an unnamed person.  (Id. at 34:8-11.)  The landlord

believed the request to be suspicious because the tenant had recently disappeared, and had stated

previously that he had no family living in the United States.  (Id. at 34:12-15.)  Special Agent

---

[7] The "toiletries bag" is also referred to as a "pouch" by some witnesses.

Alicea recognized Nidal's name from his prior investigation of Defendant, and identified Nidal as Defendant's relative.  (Id. at 34:21-35:11.)  As a result of the landlord's phone call, Special Agent Alicea stated that

> [a]t this time, I was under the impression that some of Firas Al-Salibi's belongings had been removed from where he was staying.
>
> We [we]re also under the impression he had fraudulent identification type documents, or identifications, and if they were to remove them, they would be destroyed . . . . So, basically, I took a bunch of people and went to go interview Nidal Slaibi.

(Id. at 35:19-36:1.)  Specifically, Special Agent Alicea took Special Agent Walsh, and three other detectives, to Nidal's apartment.  (Id. at 37:18-19.)  The agents were casually dressed, and their handguns were hidden beneath their clothes.  (Id. at 37:20-38:21; see also Tr. 2 13:1-7 (Nidal stated that the agents were in "regular dress," and that he did not see any weapons).)  Four of the agents weighed less than approximately 175 pounds, and four were less than five feet and ten inches tall.  (Tr. 1 37:24-38:9.)  The agents did not obtain an arrest or search warrant prior to going to Nidal's apartment.  (Id. at 36:4-17.)  Similarly, the agents did not bring consent-to-search or receipt forms, documents generally used when conducting a consent search or seizing evidence. (Id. at 57:17-22.)

Upon arriving at Nidal's home, one of the agents knocked on the door.[8]  (Tr. 2 13:17.) Special Agent Alicea asked Nidal if he "[w]ould [] mind talking to [them]?"  (Tr. 1 39:21-22.) Nidal indicated that he would speak with the agents, and gave them permission to enter his apartment.  (Id. at 39:23-40:20; see also Tr. 2 12:25 (Nidal stated, in response to a question

---

[8] Nidal stated that the knock did not startle him, and that it was a "normal" knock on the door.  (Tr. 2 13:18-23.)

6

regarding his encounter with the FBI agents, that "I invited them into my apartment.").)  The

dialogue was conversational, and Special Agent Alicea made no mention of having, or obtaining, a

search warrant, or placing Nidal under arrest.  (Tr. 1 40:5-14; see also Tr. 2 13:24-14:1.)

     2.    *The Search of Nidal's Residence*

After entering Nidal's apartment, Special Agent Alicea asked if Nidal was aware that

Defendant had been arrested.  (Tr. 1 41:5-7; see also Tr. 2 14:16-18.)  Nidal answered

affirmatively.  (Tr. 1 41:5-7; see also Tr. 2 14:18-19.)  Next, Special Agent Alicea asked if Nidal

knew the location of Defendant's belongings.  (Tr. 1 41:8-9; see also Tr. 2 14:24-25.)  Special

Agent Alicea recalled that Nidal responded,

> yeah, he does know where they are.  And told me that some of them were present in
> the apartment and some were back at the room that he was renting, that Firas rented.
> . . . At that time, Nidal Slaibi pointed behind me, and there was a suitcase, and he
> reached over and wheeled it between us and said, some of . . . the belongings were
> in this suitcase.

(Tr. 1 41:10-17; see also Tr. 2 15:1-7.)  Special Agent Alicea then asked "what's in it?"  (Tr. 1

41:25.)  Nidal responded, "mostly clothes," and then asked Special Agent Alicea if he wanted to

see the contents of the suitcase.  (Id. at 42:1-2.)  Special Agent Alicea stated that "I told Nidal, if

you want to show us what's inside, go ahead."  (Id. at 42:2-3.)  Special Agent Alicea next recalled

that Nidal opened the suitcase, "rifled through some of the clothing," and removed a couple of

CDs, a document, and gave the agents permission to "look through it."[9]  (Id. at 42:4-9.)

After reviewing the contents of the suitcase, Special Agent Alicea "asked Nidal [] if he

---

[9] Nidal's recollection differs, somewhat.  He stated that "[o]ne of the agents asked me to
open [the suitcase], to see if - - to see what's inside."  (Tr. 2 15:9-10.)  Nidal then "opened the
suitcase, and they asked me to look . . . in the sides[ to see if] there's anything [there] . . . " (Id. at
15:12-13.)

would consent to a search of his entire apartment and [the] vehicle that was outside."  (Id. at 42:21-22.)  Nidal consented and "went [to] retrieve[] his car keys so [the agents] could search the car also."  (Id. at 43:16-19; see also Tr. 2 16:14-20 (Nidal stated, in response to questions regarding the search, "I agreed, yes.").)

While the other agents searched the car and apartment, Special Agent Alicea questioned Nidal about Defendant's alleged fraudulent identification documents.  (Tr. 1 43:20-25; see also Tr. 2 16:21-23.)  Initially, Nidal lied, and said that while he knew that Defendant used such documents, he was not aware of their location.  (Tr. 1 44:1-18; see also Tr. 2 16:22-17:2.)  Nidal stated that he disagreed with Defendant's use of fraudulent identification, and that the two sometimes argued about it.  (Tr. 1 44:10-14.)  Based on Nidal's answers, Special Agent Alicea said to Nidal, "look, from what you told me, Firas using those documents is not a good thing.  You pretty much don't see eye to eye to it, so, bottom line, if you want, you don't agree with it, and you have it in your possession, you should just give it to us."[10]  (Id. at 44:25-45:4.)  As a result of Special Agent Alicea's statement, Nidal "grabbed a toiletries bag that was on the . . . dresser drawer in his bedroom and handed it to [Special Agent Alicea]."  (Id. at 45:14-16; see also Tr. 2 17:7-10.)

The toiletries bag was unzipped when Nidal handed it to Special Agent Alicea.  (Tr. 1 46:23.)  Special Agent Alicea looked into the bag, and noticed items resembling identification cards, a passport, and other, non-specific documentation.  (Id. at 47:8-16.)  He removed the document resembling a passport, opened it, and noted that the passport was in the name of Joseito

---

[10] Nidal recalled the exchange differently.  Nidal stated that Special Agent Alicea asked, "are you sure?  You know, you know, you know you have it, bring it or we search again."  (Tr. 2 17:4-6.)

Montalvo.  (Id. at 49:4-11; see also Ex. G-1.1.)  Special Agent Alicea then handed the passport, and other documents from the toiletries bag,[11] to Special Agent Walsh.  (Tr. 1 49:11-15.)  The agents removed these items from Nidal's home at the conclusion of the search.[12]  (Gov't Opp'n Ex. 3.)

Next, Nidal stated, in response to a question about additional fraudulent identification, that the agents had all of the documents.  (Tr. 1 51:13-17; see also Tr. 2 18:7-11.)  As Nidal and the two agents exited the bedroom, Special Agent Alicea asked Nidal if he carried a wallet, and if he would allow the agent to "look[] through it?"  (Tr. 1 51:19-25; see also Tr. 2 18:12-14.)  Nidal stated that he had a wallet, and agreed to it being searched.  (Tr. 1 52:3-6; see also Tr. 2 18:14-16.)  Special Agent Alicea found a Florida identification card in the name of Azra Eliaho inside Nidal's wallet.  (Tr. 1 52:3-6; see also Ex. G-2.)  Nidal then explained that he had forgotten about that identification card.  (Tr. 2 18:20.)

---

[11] Special Agent Alicea stated that the following items were removed from the toiletries bag:  1) a North Carolina Division of Motor Vehicles ("DMV") identification card in the name of Azra Eliaho, and bearing Defendant's photograph (see Ex. G-1.10); 2) a Florida DMV identification card in the name of Joseito Montalvo, and bearing Defendant's photograph (see Ex. G-1.4); 3) a New Jersey DMV identification document in the name of Joseito Montalvo, and bearing Defendant's photograph (see Ex. G-1.2); 4) a Philips Platinum Visa Card in the name of Joseito Montalvo (see Ex. G-1.8); 5) a Discover Classic Credit Card in the name of Joseito Montalvo (see Ex. G-1.9); 6) a social security card in the name of Joseito Montalvo (see Ex. G-1.3); 7) an Israeli immigration document in the name of Joseito Montalvo (see Ex. G-1.1A); 8) a New York birth certificate in the name of Joseito Montalvo (see Ex. G-1.7); and 9) two copies of a New York birth certificate (see Exs. G-1.5 and G-1.6).  (Tr. 1 50:5-51:7.)

[12] Nidal's computer was also removed from the bedroom.  However, the computer is not included in Defendant's Motion to Suppress. (Tr. 3 20:17-21:10.)

Finally, the agents noticed stacks of paper in Nidal's living room.  (Tr. 1 53:4.)  A letter, which appeared to be written in Arabic, was on the top of one stack.  (Id. at 53:4-6; see also Ex. G-3.1.)  The agents removed the letter as a part of the search.[13]  (Gov't Opp'n Ex. 3.)

 *3.* *Nidal's Written Consent*

Prior to leaving Nidal's apartment, Special Agent Alicea explained to Nidal that the agents did not have with them consent forms to memorialize Nidal's verbal consent to search his apartment and vehicle, or to list the items taken.  (Tr. 1 57:17-58:15.)  Special Agent Alicea asked Nidal if he would meet the agents later in the day so they could provide the forms.  (Id. at 58:15-19.)  Nidal agreed.  (Id. at 58:20.)

Later that day, Special Agents Alicea and Walsh met Nidal in New York City, where Nidal was working as a taxi cab driver.  (Id. at 58:21-59:8.)  The agents provided Nidal with a consent form, describing Nidal's verbal consent to search the apartment and vehicle, and a property receipt, listing all of the items taken from the apartment.  (Id. at 59:15-18; see also Tr. 2 24:12-13; Gov't Opp'n Exs. 2-3.)  Nidal reviewed the two forms, made a correction on the property receipt, and signed both.  (Tr. 1 59:18-25; see also Tr. 2 24:13-26:18.)  Nidal stated that nothing written in the consent form, or property receipt was contrary to what occurred earlier (see Tr. 2 26:16-18), the documents were clear (see id. at 27:18-20), he had enough time to review both forms (see id. at 27:15-17), and he signed them voluntarily (see id. at 27:13-14).  Nidal explained that, to him, the word voluntary meant that "[t]here was no coercion, nothing . . . that forced me to [sign the forms]."  (Id. at 27:7-12.)

---

[13] Defendant's letter to Nidal, and the translation of the letter, are not included in Defendant's motion.  (Tr. 3 20:17-21:10.)

### III.  STANDARD OF REVIEW

"A defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides."  FED. R. CRIM. P. 41(h).   Motions to suppress evidence must be made prior to trial.  FED. R. CRIM. P. 12 (b)(3)(C).

A defendant who files a motion to suppress ordinarily carries the burden of proof.  United States v. Acosta, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992) (citing Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978)).  However, where a search is conducted without a warrant, and the movant establishes a legitimate expectation of privacy, "the government bears the burden of proving that the search was reasonable."  United States v. Headen, No. 06-3965, 2008 U.S. App. LEXIS 3252, at *5 (3d Cir. Feb. 14, 2008) (citing United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995)). The Government must establish "by a preponderance of the evidence that the actions of its agents are consonant with constitutional protections."  United States v. Davis, No. 05-54, 2006 U.S. Dist. LEXIS 3591, at *11 (D. Del. Jan. 30, 2006) (citing United States v. Matlock, 415 U.S. 164, 178 n.14 (1974); and, United States v. Jacobs, 431 F.3d 99, 109 (3d Cir. 2005)).

### IV.  DISCUSSION

Before reaching the merits of Defendant's motion, this Court must first determine whether Defendant had a legitimate expectation of privacy in the items searched.  If Defendant had an expectation of privacy, the burden of proof will shift to the Government, who will be required to show that this warrantless search was reasonable, pursuant to an established exception to the warrant requirement.  This Court finds that while Defendant had an expectation of privacy in the items searched, particularly his suitcase and toiletries bag, the Government has met its burden, and established sufficiently that the search was reasonable, pursuant to two exceptions.

11

**A.      Defendant Had a Legitimate Expectation of Privacy**[14]

The Fourth Amendment right to be free from unreasonable searches and seizures is a personal right, and "may not be vicariously asserted."  Brown v. United States, 411 U.S. 223, 230 (1973); see also United States v. Padilla, 508 U.S. 77, 81-82 (1993) ("[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.").  Thus, as a threshold matter, a defendant seeking to suppress evidence must first make a prima facie showing that he has a legitimate expectation of privacy in the "invaded place."[15] Rakas, 439 U.S. at 143 (internal citations omitted).  "A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable."  Minnesota v. Olson, 495 U.S. 91, 95-96 (1990) (internal quotation omitted).

To establish a legitimate expectation of privacy, a defendant should present more than mere proof of ownership of the property seized.  Rawlings v. Kentucky, 448 U.S. 98, 105 (1980) (noting that "arcane concepts of property law" do not "control the ability to claim the protections of the Fourth Amendment . . . ").  The Supreme Court has observed that "legal possession of a seized

---

[14] The Government seemed to concede that Defendant has the requisite expectation of privacy to contest the legality of the search.  (Tr. 3 67:4-14) ("Based on Nidal's testimony, the government does believe that the defendant can point to facts in this record that establish[] standing over the suitcase and over the toiletries bag.  And that's because Nidal testified that I went over to the apartment, I got the suitcase belonging to my brother, took it home, I opened it. There was a toiletries bag or pouch, and that was also in the suitcase, therefore, that was his brother's.  So based upon what Nidal said, you can find standing.") This Court will, however, review this argument, in the event that it is mistaken.

[15] This requirement is sometimes referred to as "standing," because it directly impacts the defendant's ability to challenge a search.  See e.g., United States v. West, 508 F. Supp. 1028, 1030-31 (D. Del. 1981).

good is not a proxy for determining whether the [property] owner ha[s] a Fourth Amendment interest." United States v. Salvucci, 448 U.S. 83, 91 (1980) (citing Rawlings, 448 U.S. at 98). However, "property law is not irrelevant to the inquiry," as the Supreme Court "has not altogether abandoned use of property concepts in determining the presence or absence of privacy interests protected" by the Fourth Amendment. Acosta, 965 F.2d at 1256 (internal quotation omitted); see also Rawlings, 448 U.S. at 105 (acknowledging that the defendant's "ownership of the drugs is undoubtedly one fact to be considered" when evaluating an expectation of privacy claim).

In this case, Defendant does not claim any cohabitation rights to Nidal's apartment. Instead, Defendant's expectation of privacy claim is based on his possessory interest in the suitcase and its contents. Specifically, Defendant asserts that he has standing to challenge the search because: (1) "the property [searched] had [previously] been in Al-Salibi's home"; and, (2) Defendant "instructed his brother to recover the property and keep it secure . . . " (Def.'s Mem. in Supp. of Mot. to Suppress ("Def.'s Mem.") 4.) In fact, Nidal testified, in response to Defendant's direct request, that he retrieved both the suitcase and toiletries bag from Defendant's residence. (Tr. 2 9:8-20.)

These facts demonstrate adequately Defendant's subjective privacy interest in the suitcase and toiletries bag. Moreover, this Court finds that Defendant's expectation of privacy is sufficiently reasonable, as "'[c]ommon experiences of life, clearly a factor in assessing the existence and the reasonableness of privacy expectations, [] teaches all of us that the law's 'enclosed spaces' -- mankind's valises, suitcases, footlockers, strong boxes, etc. -- are frequently the objects of his highest privacy expectations . . .'" United States v. Salinas-Cano, 959 F.2d 861,

864 (10th Cir. 1992) (quoting United States v. Block, 590 F.2d 535, 541 (4th Cir. 1978)).  This

Court finds that Defendant has standing to contest the legality of the FBI agents' search.

**B.      Nidal Had Authority to Consent to the Search**

*1. Nidal Had Actual Authority to Consent to the Search*

Defendant argues that Nidal did not "ha[ve] sufficient authority over [Defendant's]

property to consent to a search."  (Def.'s Mem. 6.)  Indeed, Defendant states that "[t]here is nothing

in [his] letter [to Nidal] that would suggest [] authori[ty] to release the property to law

enforcement."  (Id.)  Therefore, Defendant contends, the absence of actual authority over

Defendant's belongings nullifies any consent Nidal may have given. (Id.)

In response, the Government argues that "[t]here are numerous indicia of actual authority

. . . which validate the consent to search provided by Nidal."  (Gov't Opp'n 13.)  For example, the

Government claims that "[t]he letter . . . specifically advises Nidal to access the suitcase to retrieve

the vehicle title."  (Id.)  In addition, the letter offers to Nidal all items in the vehicle.  (Id. at 14; see

also Ex. G-3.2.)  As a result, the Government argues that "[b]y giving [Nidal] joint access and

control of [the suitcase and its contents], the defendant assumed the risk that Nidal might permit

the suitcase to be searched."  (Gov't Opp'n 13.)

The Supreme Court of the United States has held that "a basic principle of Fourth

Amendment law is that warrantless searches and seizures inside a home are presumptively

unreasonable."  Acosta, 965 F.2d at 1251 (citing Payton v. New York, 445 U.S. 573, 586 (1980)).

There are, however, exceptions to this general rule.  Id. at 1254.  One exception, often referred to

as the actual authority doctrine, deems a warrantless search lawful if a third party who possesses

joint access or control over the searched "premises or effects" consents to the search.  Matlock, 415

14

U.S. at 170 ("[T]he consent of one who possesses [actual] authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.").

To validate a warrantless search under the doctrine of actual authority, the Government must establish that:  1) the third party had "joint access or control [of the premises or effects] for most purposes"; and 2) that the third party's consent was freely and voluntarily given.  Matlock, 415 U.S. at 166, 171 n.7.  The Supreme Court's recognition of this exception is based, in part, on the notion that when individuals have mutual use of property, they "have assumed the risk that one of their number might permit [a] common area to be searched."  Id. at 171 n.7.

The Third Circuit has similarly reasoned that "[a]n owner or user of property can consent to search of that property, fruits of which may be admitted against another person, only if the relationship of each person to the property demonstrates that the nonconsenting user assumed the risk that such consent might be given."  Gov't of V.I. v. Gereau, 502 F.2d 914, 926 (1974) (citing Matlock, 415 U.S. at 171 n.7; Frazier v. Cupp, 394 U.S. 731, 740 (1969)).

 This Court finds that Nidal exercised "joint access or control for most purposes" over the suitcase and toiletries bag.  Defendant specifically asked Nidal to go to Defendant's home, and "grab [his] suitcase[,] clothing and [] brush."  (Ex. G-3.2.)  Next, Defendant asked Nidal to go to the New Rochelle Park Police Station to retrieve his car, which had been impounded following his arrest.  (Id.)  In order to access the car, Defendant advised Nidal that "the car title is in the suitcase, . . . please make sure you insure it, issue a license for it and take it."  (Id.)  The letter illustrates that Defendant authorized Nidal to:  1) access to the contents of the suitcase, as well as other items in his residence; 2) remove belongings; and 3) use the contents of the suitcase to recover the impounded vehicle, suspend his cellular phone contract, and access his post office mailbox.  (Id.)

Defendant also authorized Nidal's access to the contents of the car.  (Id.)  These actions support the conclusion that Nidal exercised "joint access and control for most purposes" over Defendant's suitcase and toiletries bag.

Defendant argues, on the other hand, that he did not authorize Nidal to "surrender [his property] to law enforcement.  (Def.'s Mem. 4.)  However, this Court does not need to find that Defendant granted such specific permission in order to conclude that Nidal exercised actual authority over the suitcase and its contents.  As the Government aptly notes, "such a requirement would be illogical because no person who wished to keep his crime hidden (i.e., most criminals) would specifically authorize another person to turn over the instrumentalities of the crime to the police."  (Gov't Opp'n 14 n.12.)

Similarly, Frazier v. Cupp, 394 U.S. 731 (1969), supports this Court's finding of actual authority.  In Frazier, the defendant and his cousin, Rawls, jointly used a duffel bag that "had been left in Rawls' home."  Id. at 740.  Following Rawls' arrest, Rawls gave the officers permission to search the duffel bag.  Id.  "During this search, the officers came upon [the defendant's] clothing" and seized it.  Id.  The Supreme Court held that "[s]ince Rawls was a joint user of the bag, he clearly had authority to consent to its search."  Id.  In dismissing defendant's argument that "Rawls only had actual permission to use one compartment of the bag and that he had no authority to consent to a search of the other compartments," the Court noted that

> [w]e will not [] engage in such metaphysical subtleties in judging the efficacy of Rawls' consent. Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside. We find no valid search and seizure claim in this case.

Id. (emphasis added).  As applied here, Defendant assumed the risk that Nidal would permit a search of the suitcase and toiletries bag, and specific authorization to permit a search of the property is not required.

Finally, Defendant cites to several cases in support of his claim that Nidal lacked actual authority over his suitcase and toiletries bag.  These cases are distinguishable and inapposite.  For example, in United States v. Basinski, 226 F.3d 829 (7th Cir. 2000), the Seventh Circuit found that the third party "clearly had no actual authority over the contents of the [locked] briefcase" he was storing for the defendant, because the defendant had "never told [the third party] what was in the plastic suitcase, never gave [the third party] the combination to the lock, and never gave him permission to open it."  Id. at 832, 834.  These facts are unlike those in the case sub judice.  Here, Defendant's suitcase was not locked (Tr. 1 42:10-13; see also Tr. 2 11:10-14), Defendant informed Nidal about the contents of the suitcase, and granted him permission to access the contents (Tr. 2 6:22-7:24; see also Ex. G-3.2).

Similarly, in United States v. James, 353 F.3d 606 (8th Cir. 2000), the defendant stored various computer discs in the third party's home.  Id. at 611.  The third party believed that the defendant was storing the discs to "ensure the safety of his back-up[s]" in the event that the defendant's personal computer crashed.  Id.  The defendant's discs were password protected, and marked "confidential" and "private."  Id. at 614.  These facts "evidenc[ed] a desire that no one, including [the third party], view the contents of the disc."  Id.  In light of this, the Eight Circuit held that the third party "had no [actual] authority either to look at the contents of the discs, or to

allow anyone else to do so." Id. at 615.  No such facts are present here.  This Court, therefore, finds that Nidal had actual authority over the suitcase and toiletries bag.[16]

   *2.  The FBI Agents Reasonably Believed that Nidal Had Authority to Consent to the Search*

   Another exception to the general rule concerning warrantless searches is commonly referred to as the apparent authority doctrine.  This Court also finds that Nidal exhibited apparent authority to consent to the search of the suitcase and toiletries bag.[17]

   In order to justify a warrantless search under the doctrine of apparent authority, the Government must show that a "reasonable person, with the same knowledge of the situation as that possessed by the government agent to whom consent was given, would reasonably believe that the third party had authority over the area to be searched."  Basinski, 226 F.3d at 834 (citing Illinois v. Rodriguez, 497 U.S. 177, 188 (1990)).

> As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in belief" that the consenting party had authority over the premises?  If not, then the warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

Rodriguez, 497 U.S. at 188-89; see also United States v. Sosa, No. 05-44-1, 2005 U.S. Dist. LEXIS 31006, at *14 (E.D. Pa. Dec. 2, 2005) (stating that "[e]ven where a person's authority to consent to a search is later questioned, or is questionable, if the officers, at the time of obtaining

---

   [16] This Court will discuss the voluntariness prong of the common authority exception in Section IV.C.

   [17] This Court finds that Nidal had actual authority to consent to the search of his apartment and Defendant's belongings.  Therefore, this Court need not reach the doctrine of apparent authority.  However, this Court chooses to address this issue to demonstrate that the Government has clearly met its burden of proof relating to Nidal's authority to consent to the search.

such consent, reasonably believed that the person had authority to consent to the search, the search does not violate the Fourth Amendment.") (internal citation omitted).  To determine whether the agents' belief was reasonable, this Court must consider all surrounding circumstances.  Id.

Defendant contends that "there is no basis for law enforcement to [have] reasonably believe[d] that Al-Salibi's brother had authority to consent to the search."  (Mot. to Suppress 6.) Defendant argues that the agents "had a very clear understanding" that they were not searching "Nidal's stuff."  (Tr. 3 57:9-10.)  Defendant emphasizes that "mere possession of a container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to [the] search."  (Id.)

In response, the Government asserts that "the agents who conducted the search [] reasonably believed that Nidal had joint access and control of the suitcase and its contents for most purposes based on the information known to them" at the time.  (Gov't Opp'n 15.)  The Government points to the unlocked suitcase (Tr. 1 42:10-13; see also Tr. 2 11:10-14), unzipped toiletries bag (Tr. 1 46:16-23; see also Tr. 2 11:15-18), and Nidal's comment that the suitcase contained "mostly clothes" (Tr. 1 42:1-2), as evidence that Nidal had prior access to the suitcase's contents.  This prior access, according to the Government, justified the agents' belief that "Nidal had authority over the contents of the suitcase, and toiletries bag, and could therefore consent to a search of them."  (Gov't Letter Br. Supplementing Oral Argument 3, Jan. 18, 2008.)

This Court finds that the agents reasonably believed that Nidal had authority to consent to the search.  Here, in contrast to the cases upon which Defendant relies where third parties did not, and were not permitted to, use the contents of the container they held, see e.g., Basinski, 226 F.3d at 834; Salinas-Cano, 959 F.2d at 865, Nidal reasonably appeared to exercise authority beyond

19

mere safekeeping.  First, many of Defendant's belongings were present in Nidal's home, a place where Defendant did not exercise any cohabitation rights.  Cf. e.g., Salinas-Cano, 959 F.2d at 864-66 (the defendant resided at his girlfriend's apartment at least two nights per week, and had established a "host-guest" privacy interest in the belongings left there).  Second, Nidal represented to the agents that he actively looked through Defendant's belongings (Tr. 1 41:25-42:2), gathered and placed them in Defendant's suitcase (Tr. 2 9:8-13), and transported them back to his home (id. at 9:17-23).  In short, Nidal's statements demonstrated that he had previously accessed the items, which created an appearance of access for most purposes.  Third, the suitcase was not locked, and the toiletries bag was unzipped.  (Tr. 1 42:10-13, 46:16-23; see also Tr. 2 11:10-18.)  Therefore, the agents had no reason to suspect that Defendant had made any attempt to prevent Nidal, or others, from having access to them.  Considering these facts together, this Court finds that the FBI agents were reasonable in believing that Nidal had apparent authority to consent to the search.

## C.    Nidal's Consent Was Voluntary

Finally, Defendant argues that even if this Court finds that Nidal had apparent authority to consent to the agents' search, the evidence must be suppressed because Nidal's consent "was not freely or voluntarily given."  (Tr. 3 66:16-18.)  The Government counters this characterization with Nidal's own testimony that his consent was voluntary.  (Id. at 23:1-5; see also Tr. 2 26:14-27:20.) This Court finds Defendant's position unsupported by the record.

While a warrantless search "authorized by consent is wholly valid," the Government must establish by a preponderance of the evidence that the "consent was, in fact, freely and voluntarily given."  Schneckloth v. Bustamante, 412 U.S. 218, 222 (1973) (internal citations omitted). Consent is voluntary when it is unequivocal, specific, intelligently given, and uncontaminated by

any duress or coercion.  Id. at 226.  In determining whether consent was voluntary, a court must "examin[e] all relevant factors, without giving dispositive effect to any single criterion."  United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994).   In its consideration of the relevant circumstances, a court may examine the demeanor of the consenting party, the length of the encounter, the atmosphere of the questioning, and whether the officers made a show of force.  See, e.g., Kim, 27 F.3d at 955.   The court may also may take into account "the age of the accused [or the consenting party], his education, his intelligence, whether he was advised of his constitutional rights, and whether the questioning was repeated and prolonged."  Id. (citing Schneckloth, 412 U.S. at 226; and, United States v. Velasquez, 885 F.2d 1076, 1081-83 (3d Cir. 1989)).   Additionally, the court may consider whether the consent was memorialized in a written document.  See, e.g., United States v. Williams, No. 03-3498, 134 F. App'x. 510, 513-14 (3d Cir. 2005).

The circumstances in this case show that Nidal's consent was voluntary.  Nidal is a 36 year-old, college educated man.  (Tr. 1 119:17-120:8.)  He received his bachelor of science degree from Rutgers University in electrical engineering, and worked, for a period of time, in his field of expertise.  (Id. at 121:5-14.)  Nidal has resided in the United States since 1991, and has improved his command of the English language since that time.  (Id. at 120:13-20.)  "He's someone[, as the Government suggests,] who knows that if the FBI comes to your door and they ask you for permission [to enter,] you can refuse."  (Tr. 3 23:9-11.)

Next, the agents were plainly clothed, did not display their weapons, and arrived during daytime hours.  (Tr. 1 37:20-38:21; see also Tr. 2 13:1-7; Tr. 3 38:16.)  They were average height and weight (Tr. 1 37:24-38:9), and did not threaten Nidal in any way (Tr. 3 38:13-39:1).

In addition, Nidal testified that his verbal and written consent was voluntary.  (Tr. 2 12:25, 16:17-20, 17:21-18:1, 27:10-14.)  He stated that the consent form and property receipt list were clear (id. at 27:18-20), that he was not coerced or forced into signing either form (id. at 27:5-14), and that he had enough time to review the written documents before signing them (id. at 27:15-17). In fact, Nidal requested that a change be made on the property receipt.  (Id. at 24:21-26:3.)  This fact illustrates that Nidal felt comfortable asking questions, and correcting the agents when he believed information was inaccurate.

Similarly, Nidal met the agents after they obtained the consent form and property receipt. He did not attempt to avoid the agents, but instead "drove to where the agents were."  (Tr. 3 28:6-7.)  Finally, Nidal stated that he was treated fairly by the agents (Tr. 2 28:13-14), and did not feel threatened (id. at 25:16-17; see also Tr. 1 40:5-14 (Special Agent Alicea did not threaten to obtain a search warrant, or place Nidal under arrest).).  These facts, viewed collectively, support the Government's position.  In other words, this Court finds that the weight of the evidence demonstrates that Nidal freely and voluntarily consented to the search of Defendant's suitcase and toiletries bag.

Defendant, however, argues that the number of agents present in Nidal's apartment was, in itself, a show of force.  (Tr. 3 65:14-18.)  Defendant also submits that the fact that Nidal lied twice is additional proof that his consent was not voluntary.  (Id. at 65:19-66:22.)  These arguments, coupled with the minor discrepancies in Special Agent Alicea's and Nidal's testimony (see supra Section II.B.2 n.9-10), do not outweigh the overwhelming evidence demonstrating that Nidal's consent was voluntary.  Defendant's own cases support this conclusion, because the extraordinary circumstances present in those cases are not present here.  See e.g., United States v. Mapp, 476

F.2d 67, 77 (2d Cir. 1973) ("consent was pregnant with coercion," and therefore, not voluntary when officers, at approximately two o'clock in the morning, forcibly entered the apartment by breaking down the front door, with guns drawn; officers failed to announce their purpose prior to entry; and officers placed occupants under arrest, without giving <u>Miranda</u> warnings, before allegedly obtaining consent).

## V.  <u>CONCLUSION</u>

This Court finds that the Government has met its burden, and proved that the warrantless search of Nidal's apartment, and Defendant's suitcase and toiletries bag, was reasonable, pursuant to the actual and apparent authority exceptions.  First, the Government demonstrated that Defendant gave Nidal access and control over the suitcase and toiletries bag for most purposes. The Government also established that Nidal's consent was voluntary.  Therefore, the search was valid, pursuant to the actual authority exception.  Second, it was reasonable for the FBI agents to believe that Nidal had access and control over the suitcase and toiletries bag for most purposes.  In addition, and as stated above, Nidal's consent was voluntary.  Therefore, the search was valid, pursuant to the apparent authority exception.  For these reasons, Defendant's Motion to Suppress Evidence is denied.


Date: June 27, 2008

      S/Joseph A. Greenaway, Jr._____
     JOSEPH A. GREENAWAY, JR., U.S.D.J.